UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADIL RAZIEV, | ) |
| | ) |
| Plaintiff, | ) Case No. 13 C 00737 |
| | ) |
| v. | ) |
| | ) Magistrate Judge Geraldine Soat Brown |
| COMPASS TRUCK SALES, LLC, an | ) |
| Illinois limited liability company, and | ) |
| ALEX PETRUSHEVSKI, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| COMPASS TRUCK SALES, LLC, an | ) |
| Illinois limited liability company, and | ) |
| ALEX PETRUSHEVSKI, | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ATANAS IVAKIMOV, DONKA | ) |
| CHOUMANOVA, AND VLADI | ) |
| CHOUMANOV, | ) |
| | ) |
| Third-Party Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Motions for summary judgment have been filed in this case by defendants Compass Truck Sales, LLC and Alex Petrushevski (collectively, the "Compass defendants") [dkt 164] and the third-party defendant Atanas Ivakimov [dkt 168]. The court has carefully reviewed the record on those motions, including the transcripts of depositions submitted by the plaintiff Adil Raziev [dkt 174-178,

1

180] and Raziev's response to Compass's statement of facts [dkt 170], as well as the history of this case.

Without ruling on the reasons for summary judgment argued by the Compass defendants (which are expressly reserved), the court, pursuant to Fed. R. Civ. P. 56(f), orders Raziev to show cause why the court should not enter summary judgment against him for the reasons stated herein.

**DISCUSSION**

Fed. R. Civ. P. 56(f) provides:

Judgment Independent of the Motion. After giving notice and reasonable time to respond, the court may:

> (1) grant summary judgment for a nonmovant;
>
> (2) grant the motion on grounds not raised by a party; or
>
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Having reviewed the record, the court believes there are two reasons, independent of the Compass defendants' arguments, why summary judgment should be entered against Raziev on all counts of the complaint.

### I. Raziev's claim under the Federal Odometer Act

Based on the evidence presented on the motions, the court cannot see how Raziev can prove by a preponderance of admissible evidence that Petrushevski or any other agent of Compass "disconnect[ed], reset, or alter[ed], an odometer of any motor vehicle intending to change the

mileage registered by the odometer" with intent to defraud, as is required to prevail in a claim under the Odometer Act. *See* 49 U.S.C. § 32703(2).

In resisting Compass's earlier motion to dismiss based on Raziev's failure to preserve material evidence, Raziev argued that he could prove his case by the testimony of the witnesses and the documents. (Pl.'s Resp. Defs.' Mot. Sanctions at 4-5.) [Dkt 150.] However, now that discovery has been completed, and the evidence submitted on the present motions does not point to Petrushevski and Compass as having altered the odometer on the truck any more than it points to the third-party defendants.

Raziev's amended complaint alleges that in March 2012, he purchased a 2006 Volvo tractor truck, VIN # 4V4NC9GH06N401139 (the "truck") for $41,000 relying upon false representations made by Linas Jakovlevas, a sales consultant for Compass, that the truck had 459,000 miles and that it was still covered by the manufacturer's warranty because it had less than 500,000 miles. (Am. Compl. ¶¶ 7-12.) [Dkt 27.] In the first session of his deposition in November 2014, Raziev testified that when he went to the Compass showroom he was shown a computerized database indicating that the truck had an odometer reading of 459,000 miles. (Deposition of Adil Raziev at 24-25.) [Dkt 177-2.] He testified that he inspected the truck, checked the mileage on the truck's odometer, and "took a picture [of the odometer] right away" with his phone. (*Id.* at 28.) It was approximately the number named in the amended complaint, 459,000. (*Id.* at 29.) He testified he gave the photograph to his lawyer (*id*. at 28), but the exhibits to the deposition do not include any photograph. Raziev admits that he never discussed mileage or a warranty with Petrushevski, only price. (*Id.* at 31.)

Raziev further testified that, after buying the truck and driving it another 1,000 miles, he went to Volvo dealership in April 2012 for repairs after an accident. (*Id.* at 39, 45.) The dealership

3

checked the odometer reading against the truck's Electronic Control Module ("ECM") and confirmed that the mileage was 459,000 plus another 1,000 miles on both the odometer and the ECM. (*Id.* at 45-46.) The following day, however, Raziev testified, the dealership told him that the mileage had been rolled back on both the odometer and the ECM computer. (*Id.* at 47.)

Raziev's Count I in this lawsuit alleges that "the defendants," that is, Compass and Petrushevski, violated the Odometer Act. That claim requires Raziev to prove that Petrushevski or someone else on behalf of Compass "*disconnect[ed], reset, or alter[ed]*" the odometer of the truck that is at issue here – a physical act different from any verbal or written representations. There is no direct evidence to support that claim. Presumably, Raziev intends to rely on circumstantial evidence, but Compass was not the only one to have had custody of the truck before Raziev bought it. There are three other parties who had custody of the truck before Raziev bought it: third-party defendants Atanas Ivakimov, ("Ivakimov"), Donka Choumanova ("Donka"), and Vladi Choumanov ("Vladi"), all of whom had an opportunity to alter the odometer.[1]

Vladi and his mother Donka had custody of the truck because their company, Perfect Ten Logistics, bought the truck in 2010 for $32,805. (Deposition of Vladi Choumanov at 14-15.) [Dkt 175-1.] By August 2011, however, Vladi decided to get out of the business and sell the truck. (*Id.* at 24-26.) He and Donka put the truck in storage in August 2011, at which time, Vladi testified, it had 588,000 miles. (*Id.* at 26.) The rent for storage was approximately $100 per month. (Deposition of Donka Choumanova at 35.) [Dkt 174-1.] Vladi moved to Los Angeles in November 2011, but Donka had keys to the truck. (*Id.* at 37-39.) At some time, Vladi prepared two

---

[1] Because of the similarity of last names, this opinion refers to Donka Choumanova and Vladi Choumanov by their first names to avoid confusion. No disrespect is intended.

advertisements for the truck, one of which he posted on TruckPaper and the other he posted on Craig's List or the Bulgarian newspaper. (Vladi Dep. at 28-30.) Both advertisements said that the truck had 588,000 miles. (Vladi Dep., Ex. 3, 4.) [Dkt 175-2.] The first advertisement listed the sales price as $45,000. (Vladi Dep., Ex. 3.) Vladi got no offers to buy the truck as a result of the advertisements. (Vladi Dep. at 30.) Vladi and Donka wanted $35,000 to $40,000 for the truck, but they could not sell it for that amount. (Donka Dep. at 16.)

By February 2012, the truck had been in storage for six months and Donka had received no offers to buy it. (Donka Dep. at 15-17, 36.) Also, in January 2012, Perfect Ten was the subject of a Jeopardy Notice of Use Tax Determination and Assessment by the Cook County Department of Revenue, which assessed a penalty and interest for late payment and failure to file. (Deposition of Alex Petrushevski, Ex. 9 at 82.) [Dkt 176-7.]

The last day of the lease for the storage facility was February 23, 2012. (Donka Dep. at 17.) Shortly before that date, Donka contacted Ivakimov because someone had told her Ivakimov was in the business of selling trucks and he could help her sell the truck to Petrushevski at Compass. (*Id.*) On February 23, 2012, Ivakimov drove the truck to Compass with Donka following in her car. (*Id.* at 18-20.) Donka testified that she and Ivakimov met with Petrushevski at Compass, that she gave Petrushevski repair records for the truck, and that Petrushevski looked at the truck and indicated that it had 588,000 miles. (*Id.* at 20-23.)

Compass buys 500-600 truck tractors each year, usually from dealers and trucking companies. (Petrushevski Dep. at 199.) [Dkt 176-1.] About 5% to 10% of those are bought from individuals. (*Id.* at 200.) On February 23, 2012, Compass had 60-70 trucks on a five-acre fenced lot. (*Id*. at 25-26, 74.) Petrushevski testified that he had never met Donka before but he knew

5

Ivakimov and had bought four or five trucks from him. (*Id.* at 61-63.) When Ivakimov and Donka brought the truck in, Petrushevski walked around it, started the motor and looked at the mileage through the display behind the steering wheel. (*Id.* at 66-73.) He testified that he believes that the odometer read 459,000 miles. (*Id.* at 207.) He recorded the information, including the mileage on Compass's Excel spreadsheet (*Id.* at 73, 208.) The entry from Compass's spreadsheet, which Petrushevski testified he entered on February 23, 2012 when he accepted the truck, shows mileage of 459,874. (*Id.* at 208-211.) Petrushevski denies that he changed the mileage in the ECM or the odometer, and testified that he does not know how to change it. (*Id.* at 177-179, 221.) He denies that Donka showed him the maintenance records for the truck. (*Id.* at 231, 288.)

Compass did not buy the truck outright. Instead, on February 23, 2012, it entered into a consignment agreement with Perfect Ten. (Petrushevski Dep., Ex. 5.) [Dkt 176-3.] On March 5, 2012, Compass sold the truck to Raziev for $41,000. (*Id.* at 214-15.) Raziev put down $12,000 in cash and the rest was financed. (*Id.* at 304.) Petrushevski received $300-$400 commission on the truck. (*Id.* at 169.) Perfect Ten received $30,000 from Compass. (Donka Dep. at 34.)[2]

Raziev testified that in his first trip with the truck, he was in an accident in Columbus, Ohio. (Raziev Dep. at 39.) The Volvo dealership doing the repairs initially told him that the door could be replaced because the truck was still under warranty. (*Id.* at 40.) They connected their computer to the truck's ECM and read the mileage as 459,000 plus the 1,000 Raziev had driven it. (*Id.* at 45-46.) Later they told him they checked a database and found that mileage reading in the truck had

---

[2] None of the title documents submitted by the parties as exhibits (for example, Exhibit D to the Amended Complaint) contain a representation of mileage, because the truck was classified as exempt from the disclosure of odometer miles. 42 C.F.R § 580.17(a)(1).

6

been rolled back by a "very professional person" who changed both the odometer and the ECM. (*Id.* at 41-44, 47.)

Raziev then returned to Compass to speak to the salesman (Linas) and Petrushevski, and asked for a discount on the price. (*Id.* 53-57.) According to Raziev, Petrushevski said, "[Y]ou cannot prove anything. Don't try to prove anything. I don't deal with problems like that. This is not even my truck. Somebody has placed this truck into my yard. Do whatever you want." (*Id.* at 62.) The next day, Raziev filed a police complaint, which allowed him to get documents from the Volvo dealership about the previous history of the truck, including one showing that the truck had 507,820 miles in 2010. (*Id.* at 71-72; Am. Compl., Ex. C.) He also went online and printed out information about the truck. (Raziev Dep. at 66, 71-73.) Then he called Vladi who told him that his mother was selling the truck, and the mileage was around 588,000. (*Id.* at 74-75.) With that, Raziev returned to Compass and talked again to Petrushevski and Linas, not to resolve the matter but to tell them he was going to sue. (*Id.* at 66, 75.) Notably, Raziev did not testify that anyone at Compass admitted rolling back the odometer. Rather, he testified that Petrushevski said, "Well, choose any truck you want or just we'll reimburse your money." (*Id.* at 66-67.) But Raziev refused. Raziev then used the truck for work for another five months until the accident, which was in September 2012. (*Id.* at 91, 104.)

Petrushevski testified that the first time Raziev returned to Compass and accused him of changing the mileage, Petrushevski told him repeatedly that Compass never changed the mileage. (Petrushevski Dep. at 102.) He did not offer to take the truck back then, but tried to call Donka and did not reach her, so he called Ivakimov. (*Id.* at 105-06.) Compass would take the truck back if Donka would buy it back from Compass, which Ivakimov agreed they would do. (*Id.* at 107-09.)

7

When Raziev returned the next day, again accusing Compass of rolling the odometer back, Petrushevski again denied doing so but said, "What do want to do with the truck?" Raziev never answered that, so no agreement was reached. (*Id.* at 112-14.)

Donka testified that shortly after the truck was sold, maybe two-and-a-half weeks later, Petrushevski called her and told her that if anyone asks how many miles are on the truck, she should say 488,000, but she said she would tell the truth, that it was 588,000. (Donka Dep. at 23.)

Almost a year later, in February 2013, Compass and Petrushevski were served with the complaint. (Petrushevski Dep. at 126.) Petrushevski testified that he then called Donka and asked, "What did you guys do – do with this truck?" (*Id.* at 127.) He said she told him, "Alex, I'm sorry about the situation. It's nothing to do with me." (*Id.* at 128.)

In the fall of 2013, Petrushevski had one of his salesmen pose as a potential buyer at Ivakimov's truck sales lot. (*Id.* at 134-35.) Petrushevski testified that the salesman recorded mileage on at least three trucks that Ivakimov was selling. (*Id.* at 136.) Petrushevski then researched prior sales of those trucks and found that the mileage shown on the odometers of three trucks in Ivakimov's sales lot had been rolled back. (*Id*. at 136, 283-292; Ex. 9 at 9–20.) He then sued Ivakimov in this case because he believes Ivakimov and Donka cooperated to change the mileage to get the truck sold as soon as possible. (*Id*. at 130-31.)

The Compass Defendants moved for leave to file a complaint against Ivakimov, Vladi, and Donka on November 18, 2013. [Dkt 64.] The Third-Party Complaint was filed on December 11, 2013. [Dkt 66.] Petrushevski testified that Ivakimov called him after the Third-Party Complaint was filed and they arranged a meeting. (Petrushevski Dep. at 141-43.) According to Petrushevski, Ivakimov told Petrushevski that he had been asked by a lawyer about the truck, and told the lawyer

8

that it had less than 500,000 miles when it was delivered to Compass. (*Id.* at 149-50.) At a second meeting on December 19, 2013, Petrushevski wrote out a statement based, he said, on what Ivakimov had told him, that is, that the truck had less than 500,000 miles at the time is was sold to Compass. (*Id.* at 153-162; Ex. 1.) Petrushevski gave the statement to Ivakimov, told him to have it typed, sign it, and return it to Petrushevski, and Compass would drop the claim against Ivakimov, but Ivakimov never signed it. (*Id.* at 159-66.)

Ivakimov testified that he recalls very little about the events, although he denies rolling back the odometer. (Deposition of Atanas Ivakimov at 32, 69, 72.) [Dkt 178-1.] He did not know Donka, but a person who works cleaning trucks for him told him that Donka needed to have her truck sold. (*Id.* at 52-53.) At that time, Ivakimov had just completed bankruptcy and did not have money to buy the truck himself. (*Id.* at 53.) He says that he was "just doing [Donka] a favor" by driving the truck to Compass. (*Id.* at 25.) But he was also trying to re-establish his relationship with Compass. (*Id.* at 62.) He did not recall what the mileage said, nor did he recall whether Donka provided any maintenance records to Compass. (*Id.* at 36, 59, 65.) He recalled calling Petrushevski after being sued and meeting with him, but did not recall the circumstances around Petrushevski's writing out the statement, except that Petrushevski wrote it out in Ivakimov's presence during the meeting. (*Id.* at 37-42, 74.) He took the statement from Petrushevski, but he did not sign it or return it. (*Id.* at 60.)

It is Raziev's burden to prove by a preponderance of admissible evidence that Compass and Petrushevski physically altered the odometer. They deny it, and point to Ivakimov and Donka. The third-party defendants, in turn, deny rolling back the odometer, although they do not have any evidence that the Compass defendants did so.

9

As described above, Donka had a greater opportunity than the Compass defendants to roll back the odometer and ECM. Perfect Ten had the truck in storage for six months; Compass had it on the lot for less than two weeks. Donka also had a greater motive to roll back the mileage than Compass did. She had a truck that cost $100 per month to store and was accumulating penalties and late fees on the County use tax. After six months in storage, the truck advertised at 588,000 miles had not received a single purchase offer. Compass, on the other hand, had less motivation to sell it. This truck was just one of 50 to 60 trucks on Compass's five-acre lot. Petrushevski testified that on a consignment deal like this one, he does not care about mileage or maintenance records because Compass has no investment or obligation in the vehicle. (Petrushevski Dep. at 313.) He will accept any vehicle on consignment because "it's better to be on my parking lot than on my competition parking lot." (*Id.* at 316.)

The record does not disclose any evidence showing that Petrushevski had the technical knowledge to roll back an odometer and ECM. In contrast, Petrushevski and Compass present evidence that Ivakimov rolled back the odometer on other trucks. Although that evidence is not admissible to prove that Ivakimov rolled back the mileage on this truck, it may be admissible to show that he has the knowledge to do so. Fed. R. Evid. 404(b).

The inconclusive testimony highlights the importance of the odometer and the ECM and the evidence that could have been derived from examining them. As discussed in the earlier ruling, the Compass defendants' expert witness stated that a 2006 Volvo truck has two ECMs (also known as Electronic Control Units or "ECUs"), one for the engine and one for the dashboard display. (Mem. Opinion and Order, October 30, 2015 at 5-6.) [Dkt 156.] The total life mileage is kept in the engine ECU and cannot be altered. (*Id.* at 5.) He concluded that "without the 2006 Volvo tractor and its

10

two ECUs, it is not possible to make a definitive conclusion of the life total mileage of this truck at specific point in time." (*Id*. at 6.)

Raziev breached his obligation to preserve the odometer and ECM. (*Id.* at 8-10.) In the absence of that evidence and in light of the record presented on the present motions, the court orders Raziev to demonstrate how he can prove with admissible evidence that the Compass defendants "disconnected, reset or altered" the odometer of the truck with intent to defraud, as is required to prevail in a claim under the Odometer Act, 49 U.S.C. § 32703(2)-(3). *See, e.g., Langley v. Union Elec. Co.,* 107 F.3d 510, 514-15 (7th Cir. 1997) (removal of the furnace made the case "not triable" because "the linchpin of this case is how the furnace was hooked up"); *Lekkas v. Mitsubishi Motors Corp.*, No. 97 C 6070, 2002 WL 31163722 (N.D. Ill. Sept. 26, 2002) (with only testimony and photographs and without physical evidence, plaintiff could not sustain her burden of showing that the roof was in an unreasonably dangerous condition).

## II. Raziev's sanctionable conduct

There is a second, independent reason why the court believes summary judgment is appropriate here: Raziev's sanctionable conduct leading up to and including this case. Raziev committed a fraud by obtaining a loss payment for the truck based on a mileage figure that Raziev knew was understated. He withheld from the insurer and the salvage buyer documents that form the basis of his claim in this case. By means of that fraud, Raziev recouped the initial purchase price of the truck – and more – after he had driven it for six months. This case is a scheme to obtain a windfall on top of the fraudulently obtained insurance proceeds, and Raziev's failure to preserve material evidence furthers that effort. In addition, Raziev's testimony at his first and second

depositions is inconsistent on a key fact – the mileage shown on the odometer when he bought the truck.

As summarized in the October 30, 2015 opinion, an accident in September 2012 resulted in the total loss of the truck. Raziev filed an insurance claim with his insurer, Progressive Casualty Insurance ("Progressive"). The "actual cash value" of the truck was stated as $41,670. Progressive issued a check for $40,000 payable to Raziev and Compass Equipment Finance, LLC, representing the full loss payment for the vehicle, less a $1,000 deductible, and another check for $311.38 to Raziev for the amount of excess value because the salvage value of the truck was worth more than the insured value. On the same day that Raziev filed this lawsuit, January 30, 2013, Progressive sold the vehicle for salvage to Jemzo Motor Incorporated in Hammond, Indiana. (Mem. Opinion and Order, October 30, 2015 at 5.)

In that opinion, this court concluded that Raziev breached his duty to preserve evidence material to his claim but decided that the ultimate sanction of dismissal was not appropriate at that time. The materials submitted on the present motion, however, including the deposition of Progressive's claims representative and both sessions of Raziev's deposition, have caused the court to reconsider that decision.

Those materials show that Raziev committed a fraud to obtain the total purchase price of the truck. Raziev insured the truck for $41,000 with a $1,000 deductible. (Pl.'s Resp. Defs.' Stmt. of Facts ¶ 21.)[3] On or about September 11, 2012, Raziev wrecked the truck and filed a claim with

---

[3] Raziev's Response to Defendants' Statement of Undisputed Facts [dkt 170] does not summarize the statement to which he responds, contrary to Local Rule 56.1(b)(3)(A). It is necessary to refer to Defendants' Statement of Uncontested Material Facts [dkt164-2] to see what Raziev has admitted.

Progressive. (*Id.* ¶ 22.) Daniel Billisitz, the insurance claims specialist for Progressive, handled Raziev's claim from start to finish. (Deposition of Daniel Billisitz at 9-10.) [Dkt 180-1.] Progressive's Claim Notes reflect that Raziev said he lost control of the vehicle and it rolled over. (Billisitz Dep., Ex. E, Claim Notes at 100-01.) [Dkt 180-4.] At the time of the accident, Raziev was using the truck for work, carrying a load from Ohio to Indiana. (*Id.* at 103.) When Billisitz spoke with Raziev on September 14, 2012, Raziev said the truck was not repairable and he wanted "to get paid off for total losses and get another truck and trailer." (*Id.* at 104.) Billisitz inspected the truck but could not get the mileage from the odometer because there was no key to start the truck and the battery cables had been cut. (Billisitz Dep. at 32; Claim Notes at 104.) Billisitz testified, "The insured [Raziev] told me there was 505,000 miles on it. . . . We ask for service records, things like that, to see if possibly they have proof of mileage, and he couldn't provide any." (Billisitz Dep. at 33.) The Claim Notes confirm that conversation:

> Unable to get mileage. Key not with I[nsured] V[ehicle]. Battery cables cut. Got mileage from N[amed] I[nsured] off the phone said was 505K. Asked if had p/w [paperwork] to prove [,] *said no does not have any*. That is close to average mileage for this truck so ran VVS [vehicle valuation services] with that.

(Claim Notes at 104 (emphasis added).)

Billisitz explained, "[I]f we don't have proof of mileage, we'll run with it based on what the customer tells us, and if it is in line with the average mileage, then we just run with that." (Billisitz Dep. at 34.) Billisitz testified that Raziev stated the mileage number as 505,000. (*Id.* at 84.)

Billisitz and Raziev talked again on September 25, 2012. The Claim Notes state:

> Reviewed [payment] with customer [Raziev]. Said there is possibly a discrepancy in the mileage. Odometer shows 460K, VVS ran with 505K. Said may not be accurate. I was unable to get mileage off truck due to damage. With a mileage discrepancy the salvage bid from KJ Auto went down. It is there storage free. Will

13

send to the pool as now has a higher salvage bid. Advised customer *will leave VVS value at 505K as no proof, paperwork and unable to check.* That is slightly below average but no way of knowing besides reading computer. Customer said have Volvo Dealer run computer, there is a problem there as well so cannot be read."

(Claim Notes at 109 (emphasis added).)

Billisitz testified that Raziev told him the odometer showed 460,000 at the time of the accident, but then Raziev said there was a discrepancy between the odometer and the actual milage. (Billisitz Dep. at 82-87.) The initial salvage bidder lowered its bid because there was a possible discrepancy in the mileage. (*Id.* at 40.) Progressive tried to get paperwork from Raziev to confirm the mileage but he was unable to provide any paperwork, so they left the mileage at the estimate of 505,000. (*Id.* at 39-42.) Billisitz testified, "The customer couldn't provide paperwork and we could not run the ECM or see the odometer with the battery cables cut." (*Id.* at 41.)

Raziev admits that he told Billistiz that the truck had approximately 460,000 miles and approximately 505,000 miles at the time of the accident. (Pl.'s Resp. Defs.' Stmt. of Facts at ¶¶ 26, 27.) He testified that he told the insurance representative that the odometer had a problem, but that "when I bought the truck it had 459,000 miles on it." (Raziev Dep. at 107.) "The only story that I told him was when I bought the truck it was 459,000 miles and I don't know how many miles there were at the time of the accident." (*Id.* at 109.)

Of course, Raziev knew that the mileage on the truck in September 2012 was far in excess of 505,000. He had documentation showing the mileage exceeded 505,000 – the documentation that he presented to Petrushevski five months earlier and that he attached to his complaint in this case. (Raziev Dep. at 71-75.) That includes the printout showing that in February *2010*, the odometer reading was 507,820. (Am. Compl. ¶ 15, Ex. C.) That printout was generated on "3/28/2012." (*Id.*)

That also includes Vladi's advertisement showing the truck had 588,000 miles. (Am. Compl. Ex. E.) Raziev attempts to use documentation he withheld from the insurer as evidence in this lawsuit.

Raziev alleges that he would not have purchased the truck if he had known it had 588,000 miles, and that the "true value of the vehicle" was worth less than $41,000. (*Id*. ¶¶ 21, 24.) Yet he insured the truck for $41,000 and did not change that insurance value after learning about the mileage. As a result of his misrepresentations about the mileage during the course of his insurance claim, Raziev received not only the purchase price of the vehicle ($41,000) less the deductible, he received $311.38 more than the purchase price. (Pl.'s Resp. Defs.' Stmt. of Facts at ¶ 32.) The salvage value of the truck (based on Raziev's misrepresentation of the mileage) was more than the purchase price. (Billistiz Dep. at 49, 52.)

In addition, in the second session of his deposition, Raziev changed his story about what the odometer read on the day he bought his truck. From the beginning of this lawsuit, Raziev has contended that the odometer said 459,000 miles. (*See* Am. Compl. ¶ 7: "The Odometer reading indicated 459,000 miles.") At his first deposition session in November 2014, Raziev testified that he looked at the truck's mileage on Compass's computer screen when he was buying the truck and it read as alleged in his complaint – 459,000. (Raziev Dep. at 24-25.) He also checked the mileage on the odometer and it was approximately 459,000 miles as stated in the complaint. (*Id*. at 29.) At the second session of his deposition two months later, however, he changed his story about the mileage on the truck at the time he purchased it. In January 2015, Raziev testified repeatedly that the truck's odometer read approximately *416,000* miles at the time he purchased it: "[A]t the time I was purchasing the truck, it read approximately 416,000 miles, approximately." (Second Deposition of Adil Raziev at 5.) [Dkt 177-3.] "It said 416,000. And I don't remember the exact."

15

(*Id.* at 21.) "I said that I bought the truck with an odometer reading of 416,000 miles approximately." (*Id.* at 27.) He admits that he testified under oath at least four times that the truck had approximately 416,000 miles when he bought it from Compass. (Pl.'s Resp. Defs' Stmt. of Facts ¶ 23.)

He also testified at the first session of his deposition that he took a picture of the truck's odometer "right away" with his phone as he looked at the truck before he bought it. (Raziev Dep. at 28.) It read approximately the number named in the amended complaint, 459,000. (*Id.* at 29.) Where is that photograph? He said he gave the photograph to his lawyer (*id.* at 28), but the exhibits to the deposition do not include any such photograph. Raziev's response in opposition to the earlier motion for sanctions included a photograph that he represented in the response was the photograph of the odometer that he took at the time he bought the truck, but the mileage on that photo is 462,137. (Pl.'s Resp. Defs.' Mot. Sanctions. at 1; Ex. A-1.) [Dkt 150.] That is *exactly* the same mileage reported on the truck when he took it in for repairs on March 29, 2012 after having driven it for several weeks and being involved in an accident on the way back from Ohio. (*See* Raziev 2nd Dep., Ex. 11.) [Dkt 177-4.] That cannot be the photograph Raziev testified he took before he bought the truck. There are two possibilities: either Raziev lied under oath when he testified he took the photograph as he was buying the truck or he failed to preserve another piece of material evidence.

There is no excuse for Raziev's failure to preserve material evidence (the odometer, the ECM and the photograph) because he knew when he returned to Compass for the second confrontation with Petrushevski that he was going to sue Compass. (Raziev Dep. at 66.) He testified that he told Progressive's insurance representative in September 2012 that he was suing Compass. (*Id.* at 107.) Yet the Claim Notes reflect that when Progressive offered Raziev the salvage of the truck, Raziev

16

told Billisitz that "[h]e does not want to retain salvage on either I[nsured] V[ehicle]." (Claim Notes at 109.)

The court may impose sanctions where necessary to prevent abuses of the judicial process and promote the efficient administration of justice. *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993), citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). "This power is 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Barnhill*, 11 F. 3d at 1367 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)). As observed in the October 30, 2015 Opinion, the district court's inherent authority also allows for dismissal for discovery violations or bad faith conduct. *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 758-59 (7th Cir. 2005). Contumacious conduct that may merit dismissal includes fault, bad faith, or willfulness. *See id.*

> Although wilfulness and bad faith are associated with conduct that is intentional or reckless, the same is not true for "fault." Fault "does [not] speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation."

*Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) (quoting *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)).

The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power. *Barnhill*, 11 F.3d at 1367. Although the court should consider what effect, if any, the challenged conduct has had on the course of the litigation,

> [m]isconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.

*Id.* at 1368.

Here, Raziev has displayed flagrant contempt for truth, which is at the center of judicial process, and also caused prejudice to the defendants and third-party defendants.

It is important to view Raziev's actions in this case within the context of Raziev's entire scheme. In *Dotson v. Bravo,* 321 F.3d 663 (7th Cir. 2003), the Seventh Circuit affirmed the district court's decision to impose dismissal as a sanction for conduct including filing under a false name and lying under oath. The district court properly considered the plaintiff's "overall scheme to defraud 'all aspects of the judicial process.'" *Id*. at 668-69 (quoting *Barnhill*, 11 F.3d at 1368). The Seventh Circuit concluded that "[n]o rule prohibits our consideration of [plaintiff's] actions prior to the filing of the underlying lawsuit, and we will factor that behavior into our analysis." *Dotson*, 321 F.3d at 669.

Raziev was angry when he got the report showing that the truck had more miles than he believed it had, and when he heard that Compass had paid Donka $30,000 for the truck, he believed he had overpaid $11,000 for the truck. (Raziev 2nd Dep. at 23-24.) When he went back to Compass for the second confrontation, however, he did not try to negotiate a resolution; instead, he decided then to sue. But instead of suing promptly on the claim, he drove the truck for six months until it was finally totaled. Although he knew then that he intended to sue the Compass defendants, he did nothing to preserve the physical evidence – the odometer and the ECM – that is at the heart of his claim under the Federal Odometer Act. As the Compass defendants' expert stated, that evidence might allow a forensic analysis of whether, when, and by whom any tampering took place. The physical evidence becomes strikingly important in light of the inconclusive circumstantial evidence

18

described above in which a number of parties had custody of the truck at different times. Progressive offered Raziev the opportunity to preserve the physical evidence, but he wanted the salvage money for the truck. Then, on the very day the physical evidence passed out of his and Progressive's control, he filed the lawsuit, which proves that he had previously retained a lawyer to advise him.

As described above, Raziev has given different numbers about what the mileage was on the truck – several of those different numbers given under oath. Most important, however, are the misrepresentations to Progressive. The gravamen of this lawsuit is Raziev's assertion that he was defrauded by paying $41,000 for the truck because its "true value" was much less as a result of the mileage actually being 588,000 when he bought it. Yet he never revealed to Progressive that the actual mileage was 588,000 when he bought the truck, and the mileage must have been considerably greater after six months on the road. He concealed from Progressive the documentation he intends to use as evidence in this case in order to get the benefit of asserting a lesser mileage.

The complete history suggests why Raziev waited to file this lawsuit until the insurance proceeds were paid and the truck was conveyed to the salvage buyer. If he had filed earlier, Progressive and the salvage buyer may have learned of Raziev's pleading that the "true value" of the truck was much less than the amount for which Raziev insured it and which they paid.

The court concludes that this case was brought in bad faith after Raziev had recovered *more* than what he claims as the "true value" of the truck, that Raziev knowingly took advantage of the alleged odometer rollback because it allowed him to misrepresent the mileage to the insurer and salvage buyer, that he knowingly concealed documents about mileage from the insurer and the salvage buyer, that at the time he brought this lawsuit, Raziev knew that the odometer and ECM which are material to his claim under the Odometer Act no longer existed because he had failed to

19

preserve them. The court concludes that it would "raise concerns about the integrity of the civil justice system" to allow this case to continue.

This case has cost the parties involved, most of whom are individuals of modest means, considerable expense and loss of productive time. The court also recruited volunteer counsel to represent Donka and Vladi because they demonstrated they were unable to afford counsel. Raziev is hereby ordered to show cause why summary judgment should not be entered against him as a sanction under the court's inherent authority. Raziev and his counsel shall also show cause why, if summary judgment is granted, the court should not award attorneys' fees and costs to the defendants and third-party defendants.

## CONCLUSION

Plaintiff Adil Raziev is hereby ordered to show cause why summary judgment should not be entered against him for each of the two independent reasons set out above. Plaintiff and his counsel shall also show cause why, if summary judgment is granted, the court should not award attorneys' fees and costs to the defendants and third-party defendants. Plaintiff's submission under this order shall be filed with any additional supporting material no later than April 27, 2016. Trial dates previously set for May 10 through May 12, 2016 and the deadline for motions in limine are hereby stricken to be reset if necessary.

IT IS SO ORDERED.

_Geraldine Soat Brown_
Geraldine Soat Brown
United States Magistrate Judge

April 13, 2016