# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ADIL RAZIEV, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COMPASS TRUCK SALES, LLC, an )<br>Illinois limited liability company, and )<br>ALEX PETRUSHEVSKI, )<br>)<br>Defendants. )<br>_____)<br>)<br>COMPASS TRUCK SALES, LLC, an )<br>Illinois limited liability company, and )<br>ALEX PETRUSHEVSKI, )<br>)<br>Third-Party Plaintiffs, )<br>)<br>v. )<br>)<br>ATANAS IVAKIMOV, DONKA )<br>CHOUMANOVA, AND VLADI )<br>CHOUMANOV, )<br>)<br>Third-Party Defendants. ) | Case No. 13 C 00737<br><br>Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

Plaintiff Adil Raziev has filed a response to the court's previous Memorandum Opinion and Order directing him to show cause why summary judgment should not be entered pursuant to Fed. R. Civ. P. 56(f). (Pl.'s Resp.) [Dkt 196.] As noted in the earlier Order, motions for summary judgment have been filed by defendants Compass Truck Sales, LLC and Alex Petrushevski

1

(collectively, the "Compass defendants") [dkt 164] and the third-party defendant Atanas Ivakimov [dkt 168]. Having considered Raziev's response and the material submitted in connection with the summary judgment motions, along with the history of this case, the court grants summary judgment in favor of the Compass defendants against Raziev and dismisses the Compass defendants' Third-Party Complaint with prejudice as moot.

## SUMMARY

This opinion will not repeat the factual background set out in the April 25, 2016 Memorandum Opinion and Order (Show Cause Order [dkt 192]), which is incorporated by reference. In short, after reviewing the evidence submitted on the motions for summary judgment, the court directed Raziev to show cause why summary judgment should not be granted for two separate reasons: first, because it did not appear from the evidence that Raziev could carry his burden of proof for his claim under the Federal Odometer Act, 49 U.S.C § 32703(2) that the Compass defendants had rolled back the odometer of the 2006 Volvo truck Compass sold him; and second, as a sanction for Raziev's fraud and abuse of the process. (Show Cause Order at 2, 11, 20.) Having reviewed Raziev's response to the Show Cause Order, the court again concludes that summary judgment is appropriate for a number of reasons.

## DISCUSSION

**I. Raziev's inability to establish his claim under the Odometer Act.**

<u>Additional factual material in response to Show Cause Order</u>

Raziev's response adds to the record the deposition of Charles Bird, a professional engineer employed by Volvo Group North America to investigate product liability claims, who testified generally about the Electronic Control Modules ("ECMs") and Electronic Control Units ("ECUs") in Volvo trucks, and specifically about records produced by Volvo in response to Raziev's subpoena in this case. (Dep. Charles Bird at 11-15, 46-47.) [Dkt 197-2.]

Bird testified that the ECM is the module and the ECU is the processor unit itself. (*Id*. at 75.) There are a number of ECUs in the vehicles, which control functions of the vehicle, or read or store information from the vehicle. (*Id.* at 13-14.) Two ECUs relate to mileage: one located in the "gauge cluster" in front of the steering wheel, which provides information to the dashboard odometer, and one in the engine that registers accumulated miles. (*Id.* at 14, 18, 54, 72-73, 84.) The engine ECU records mileage but is not considered as accurate or stable a record. (*Id.* at 84.) The odometer in the dashboard reads the mileage from the ECU in the gauge cluster, which is a panel about a foot wide and eight or nine inches tall. (*Id*. at 20-21, 74.) To "roll back" the odometer would require opening up the gauge cluster and connecting to the ECU through software. There is no mechanical adjustment. (*Id.* at 74-75.)

The ECU that provides information to the odometer can be altered with appropriate software, but not if the user is connected to the Volvo main frame computer system. (*Id.* at 18-19, 37-39.) In that situation, if the user tries to register a number lower than the last warranty data on Volvo's records, the system will automatically reset it. (*Id.* at 39.) The gauge cluster itself can be replaced with a different gauge cluster, but the Vehicle Identification Number would be different. (*Id*. at 78, 86.)

Volvo's Vehicle Data Administration records show information from warranty claims and recalls, not necessarily all repairs. (*Id*. at 15, 24.) The information on a warranty claim report is not taken from the vehicle's ECU itself; rather, that information is "keypunched," he said, into the system by the operator at the dealership. (*Id* at 16.) Bird has seen numbers on those reports that are inaccurate because the person incorrectly typed the information, for example, transposing the numbers. The warranty records do not necessarily report what was on the odometer, only what was entered in the computer system. (*Id*. at 36-37.)

As to the 2006 Volvo truck at issue in this case, Volvo's records show no history of any alterations in the programming information for the gauge cluster. (*Id*. at 15.) There are a number of warranty claim records from 2007 and 2008 showing warranty coverage for repairs under a purchased warranty limited to "38 months or 450,000 miles." (*See, e.g,* Bird Dep. Ex. A, bates no. 95: a repair order in August 2008, showing 440,837 miles.) [Dkt 200-1.] There are no warranty repairs later than 2008, but there are later recall repair records. In February 2010, when certain recall repairs were done, the mileage listed on the report was 507,820. (*Id.*, bates no. 52.) [Dkt 199-2.] A recall repair record dated March 21, 2012 shows an odometer reading of 462,137. (*Id.*, bates no. 54.) Bird testified that possible explanations for the discrepancy besides rolling back the odometer include an error by the dealer entering the numbers or a failure of the odometer unit. The unit failures that he has seen, though, have been odometers that are stuck on a number or advancing too fast. (Bird Dep. at 40-42.)

Bird testified to his understanding that the ECU is an erasable programmable read only memory, and, based on that understanding, it would not be possible to tell if the ECU had been physically altered. (*Id.* at 58.) He said there would be no time stamp to indicate when it was altered.

A damaged ECU would be worthless, in his opinion. (*Id*. at 59.) On the other hand, the fact that a claims adjuster was not able to get a reading from the dash odometer or ECU does not mean that the ECU was damaged in a crash. "[O]ftentimes when vehicles are wrecked they disconnect the battery . . . . Since the batteries aren't connected, you can't get a reading on it, because you're just turning on the switch with no power to the switch itself." (*Id*. at 103.)

Raziev also submitted his own affidavit dated April 27, 2016. (Aff. Adil Raziev) [Dkt 201-2.] He now states that he communicated with the Progressive Casualty Insurance ("Progressive") adjuster in Russian through an interpreter, and that the adjuster only asked for the title to the truck. (*Id*. ¶¶ 4, 6.) He says that he told the adjuster "that the mileage had been rolled back and that the reading was not correct" and that he wanted to sue the persons responsible for the roll back. (*Id*. ¶¶ 5, 7.) He states that he only took one photo of the truck's odometer, which he took before he bought the truck, and he "did not take any other photo[s] of the odometer." (*Id*. ¶ 8.) He says that he showed that photo to the repair dealership on March 21 or 22, 2012, and believes they used the mileage from that photograph when they prepared the documents for the repairs. (*Id*. at ¶¶ 8-10.)

Analysis

The Show Cause Order required Raziev to show how he can carry his burden of proving by a preponderance of admissible evidence that Alex Petrushevski ("Petrushevski") or another agent of Compass "disconnect[ed], reset, or alter[ed], an odometer of any motor vehicle intending to change the mileage registered by the odometer" with intent to defraud, as is required to prevail in a claim under the Odometer Act. (Show Cause Order at 2-3.) Petrushevski and third-party

5

defendants Atanas Ivakimov ("Ivakimov"), Donka Choumanova ("Donka"), and Vladi Choumanov ("Vladi") all deny that they rolled back the odometer.[1]

There is no direct evidence about where, when, how, or by whom the odometer was rolled back.[2] Raziev argues that he can show by circumstantial evidence that the Compass defendants were the only parties that had control of the truck when the odometer was rolled back. (Pl.'s Resp. at 2, 20.) However, nothing in the record establishes exactly – or even approximately – when the odometer was rolled back. As described in the Show Cause Order, the truck was in the custody of Donka and Vladi much longer than it was on the Compass dealership lot, and the evidence points just as much, if not more, to Ivakimov, Donka, and Vladi as to the Compass Defendants.

The only material documents on this issue are: the February 2010 repair report in which the dealer entered in mileage of 507,820; Vladi's advertisement from the fall of 2011 stating the truck had 588,000 miles; Compass's records listing the truck at 459,874 miles when it arrived at Compass in February 2012; the March 21, 2012 recall repair in which the dealer entered 462,137 miles; and a photograph also showing 462,137 miles (discussed below). The testimony boils down to Ivakimov's and Donka's testimony that the odometer showed 588,000 when Ivakimov drove it to Compass's lot, and, conversely, Petrushevski's testimony that the odometer showed approximately 459,000 miles when the truck arrived at Compass's lot.

---

[1] Because of the similarity of last names, this opinion refers to Donka Choumanova and Vladi Choumanov by their first names to avoid confusion. No disrespect is intended.

[2] That is assuming, for the sake of argument, that it was rolled back, as opposed to having failed in some way. Raziev has not presented any evidence about the odometer itself, which he permitted to be destroyed as the lawsuit was being filed.

Raziev himself has given contradictory evidence about what the odometer showed when he bought the truck. In his pleadings and in the first session of his deposition he said 459,000 miles. (*See* Am. Compl. ¶ 7 ("The Odometer reading indicated 459,000 miles.") [dkt 27]; Raziev Dep. at 24-25, 29 [dkt 177-2].) At the second session of his deposition, however, Raziev testified repeatedly that the truck's odometer read approximately *416,000* miles at the time he purchased it.[3] Now Raziev submits his affidavit in which he states, again under oath, that he took *only one* photograph of the odometer, which he took *before* he bought the truck, that he showed the photo to the repair dealer, and that he believes the photo was the basis for the dealer's report of mileage, which was *462,137*. (Raziev Aff. ¶¶ 8-10.) Raziev has only put one odometer photograph into the record of this case, the one with a handwritten notation "Picture from Adil's," which shows "462,137." (*See* Show Cause Order at 16, citing Pl.'s Resp. Defs.' Mot. Sanctions, Ex. A-1 [dkt 150-1].)

Each time Raziev has testified under oath about what the odometer read when he bought the truck, it has been a different number: 459,000, 416,000, or 462,137. That is not a rounding error. That is a swing of almost 50,000 miles. Raziev has failed to establish even the most basic fact: what the odometer read when he bought the truck.

To succeed on his Odometer Act claim, Raziev must prove not only that the odometer was rolled back at some time before he bought the truck, but that the *Compass defendants* rolled it back, and that they did so with the specific intent to defraud him based on the rolled back mileage. *See*

---

[3] "[A]t the time I was purchasing the truck, it read approximately 416,000 miles, approximately." (Second Raziev Dep. at 5.) [Dkt 177-3.] "It said 416,000. And I don't quite remember the exact." (*Id.* at 21.) "I said that I bought the truck with an odometer reading of 416,000 miles, approximately." (*Id.* at 27.) He admits that he testified under oath at least four times that the truck had approximately 416,000 miles when he bought it from Compass. (Pl.'s Resp. Defs.' Stmt. of Facts ¶ 17 [dkt 170]; Compass Defs.' Stmt. of Facts ¶ 17 [dkt 164-2].)

49 U.S.C. §§ 32703, 32710. The statute requires that "a transferor's fraudulent intent relate to the vehicle's mileage." *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 713 (7th Cir. 2005). Where is Raziev's proof of that element? Compass was not required to disclose the mileage because the truck was exempt under the applicable regulations. 49 C.F.R. § 580.17(a)(1). Raziev pled that he thought the truck was covered by the manufacturer's warranty up to 500,000 miles (Am. Comp. ¶ 11), but he admits that he never discussed mileage or warranty with Petrushevski. (Raziev Dep. at 31.) The bill of sale that Raziev signed says "no warranty." (Raziev Dep., Ex. 8.) [Dkt 176-6.]

Summary judgment should be granted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court may grant summary judgment on grounds not raised by a party after the affected party has had an opportunity to respond, as Raziev was given here.

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

As the Seventh Circuit has phrased it, summary judgment is the "put up or shut up moment in a lawsuit." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1077 (7th Cir. 2016) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)). While the court must construe all facts and reasonable inferences in favor of the nonmoving part, that does not extend to drawing inferences that are supported only by speculation or conjecture. *Citizens for Appropriate Rural Roads*, 815 F.3d at 1074. Raziev has had a full opportunity to demonstrate that there is sufficient evidence under which the court could grant judgment in his favor and against the Compass

defendants on his Odometer Act claim, but the record discloses only speculation and conjecture. The court fails to see how Raziev could demonstrate by a preponderance of the evidence that the Compass defendants altered the odometer of the truck with an intent to defraud him. Accordingly, there is no genuine issue for trial and the Compass defendants are entitled to summary judgment on Raziev's claim under the Odometer Act.

II.     **Raziev's other claims require proof of damages.**

In addition to his Odometer Act claim, Raziev also pled claims under the Illinois Consumer Fraud and Deceptive Practices Act ("Consumer Fraud Act," 815 Ill. Comp. Stat. 505/1-12), and common law fraudulent misrepresentation, fraud, and breach of contract. (Am. Comp.)[4] The Compass defendants argue that they are entitled to judgment on those claims because those claims require Raziev to prove actual damages, which he cannot prove here. (Defs.' Mem. Supp. Rule 56 Mot. ("Defs.' Mem.") at 4-7.) [Dkt 164-1.]

As discussed in the Show Cause Order, a collision in September 2012 resulted in the total loss of the truck. Raziev filed an insurance claim with Progressive. Although Raziev had paid $41,000 in total for the truck six months earlier, the "actual cash value" of the truck was stated as $41,670 based on an estimated 505,000 miles. Progressive issued a check for $40,000 payable to Raziev and Compass Equipment Finance, LLC, representing the full loss payment for the vehicle, less a $1,000 deductible, and another check for $311.38 to Raziev for the amount of excess value because the salvage value of the truck was worth more than the insured value of $40,000. On the

---

[4] Two other counts were dismissed with prejudice. (Mem. Opinion and Order, Sept. 10, 2013.) [Dkt 45.]

9

same day that Raziev filed this lawsuit, January 30, 2013, Progressive sold the vehicle for salvage to Jemzo Motor Incorporated in Hammond, Indiana. (*See* Show Cause Order at 12-14; *see also* Mem. Opinion and Order, October 30, 2015 at 5 [dkt 156].)

A private action under the Consumer Fraud Act requires proof of actual damages. "Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 Ill. Comp. Stat. 505/10a(a). In *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005), the Illinois Supreme Court addressed a claim similar to Raziev's. In that case, the plaintiff alleged that State Farm installed inferior replacements parts on his vehicle, but the plaintiff later sold his vehicle with no discount due to the parts. *Id.* at 859. The court held that because the sales price was not diminished because of the allegedly inferior parts, there were no actual damages and the plaintiff had no recovery under the Consumer Fraud Act. *Id.*

Raziev argues that he has $11,000 in damages because Compass paid Donka only $30,000 for the truck. (Pl.'s Resp. to Defs.' Mot. Summ. J. at 4.) [Dkt 172.] In other words, he wants more than the amount he paid for the truck. He wants not only his purchase price (which he received from Progressive) but also Compass's mark-up on the truck, and all of this after he used the truck for six months.[5]

Raziev also argues that Progressive's payment is the result of his having insurance, and that the collateral source rule does not allow consideration of insurance benefits in determining his damages. (*Id.* at 4-6.) The *Avery* decision precludes Raziev's argument, and, if anything, applies

---

[5] What Compass paid its consignor is, of course, irrelevant. Raziev's argument ignores the fact that Compass is entitled to a profit for providing the retail venue and sales force to market and sell the truck, as well for handling all the documentation of the transaction.

with more force here. In that case, the Court said, the plaintiff "received the same value for the truck that he would have received if only OEM parts had been used in the repair. . . . Clearly, [the plaintiff] suffered no 'actual damage' as a result of State Farm's specification or use of non-OEM parts, and, therefore, he cannot recover under the Act." *Avery,* 835 N.E.2d at 859. Here, Raziev received more than he paid for the truck – after he had used it for six months – based on his misleading statements to the Progressive claims adjuster about the actual mileage on the truck. (*See* Show Cause Order at 11-14.) Raziev has suffered no actual damages as a result of any alleged misrepresentations about the mileage on the truck, and the Compass defendants are entitled to judgment on that claim.

Likewise, Raziev's common law claims for fraudulent misrepresentation (Count IV), fraud (Count V), and breach of contract (Count VII), all of which are based only on the alleged understatement of the mileage on the truck, also require proof of damages.

"In order for a plaintiff to prevail on a claim of fraudulent misrepresentation, he or she must establish the following elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008) (collecting cases).

"The elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996) (collecting cases).

11

"The elements of a breach-of-contract action are: (1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff." *Pyramid Development, LLC v. Dukane Precast, Inc.*, 40 N.E.3d 1185, 1194 (Ill. App. Ct. 2d 2014).

As the evidence has developed, there are many problems with Raziev's claims. For example, although he would be required to prove that a representation about the truck's mileage was a material term of his purchase, he has not been able to testify consistently what the mileage was represented to be when he bought it – 459,000 miles, 416,000 miles, or 462,137 miles. He also admits that he never discussed mileage with Petrushevski.

The central fact, however, is that Raziev used the truck in his work as a commercial truck driver for six months until it was totally destroyed, and then he received more than he paid for it. He had an opportunity shortly after the purchase to return the truck and obtain a refund, but he admits that he refused Petrushevski's offer. (*See* Show Cause Order at 7.) Even assuming for the sake of argument that he could prove the other elements of his claims, he has no damages from the fact that the truck had more miles than he claims he thought it had when he bought it.

Accordingly, there is no genuine issue for trial on these claims and the Compass defendants are entitled to summary judgment on Raziev's claim under the Consumer Fraud Act and his common law claims.[6]

---

[6] The Compass defendants also argue that Progressive, not Raziev, is the real party in interest, focusing on the fact that Raziev assigned all of his rights relating to the truck to Progressive in exchange for the insurance proceeds totaling more than he paid for the truck. (Def.'s Mem. at 1-4.) Raziev's policy with Progressive contained an assignment of all rights relating to the truck:

> In the event of any payment under this policy, we [Progressive] are entitled to *all the rights of recovery of the person or organization to whom payment was made.* That person or organization must sign and deliver to us any legal papers relating to that recovery, do whatever else is necessary to help us exercise those rights, and do

nothing after the loss or accident to harm our rights.

(Illinois Commercial Auto Policy Agreement at 20, General Provisions ¶ 6 (emphasis added).) [Dkt 180-3.]

That argument has some force. Progressive paid Raziev the full purchase price of the truck – and then some – less the deductible, and in return received not just title to and ownership of the truck, but an assignment of all of Raziev's rights relating to the truck. Raziev argues that Progressive is not subrogated to his rights against the Compass defendants because the Compass defendants did not cause the collision that damaged the truck, referring to the principle of equitable subrogation. (Pl.'s Resp. to Defs.' Mot. Summ. J. at 2-3.) That is not, however, the applicable principle.

Illinois law recognizes "two broad categories of subrogation rights: contractual or conventional rights and common law or equitable rights. Contractual rights are those expressly provided for in the insurance policy or other instrument. . . . The other class of right to subrogation, equitable subrogation, is implied to have been intended where necessary to avoid an inequitable and unfair result." *Schultz v. Gotlund*, 561 N.E.2d 652, 653 (Ill. 1990) (citations omitted). "The doctrine of subrogation is a creature of chancery. It is a method whereby one who has involuntarily paid a debt or claim of another succeeds to the rights of the other with respect to the claim or debt so paid." *Dix Mut. Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 624 (Ill. 1992.)

Here, Progressive's rights arise by virtue of the insurance policy. "'The right of an insurer to subrogation is measured by and depends solely on the terms of the subrogation provisions in the contract.'" *Elec. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 346 F. Supp. 2d 958, (N. D. Ill. 2004) (quoting *Hack v. Multimedia Cablevision, Inc.*, 696 N.E.2d 694, 696 (Ill. App. 1st 1998).

Progressive paid Raziev the full cost of the truck and, in exchange, Raziev turned over to Progressive the truck itself and "all rights of recovery" related to it.

Fed. R. Civ. P. 17(a)(1) requires that every action be prosecuted in the name of the real party in interest. If Progressive is the real party in interest, the rule directs the court not to dismiss the action but to allow a reasonable time for Progressive to ratify, join or be substituted for Raziev. Fed. R. Civ. P. 17(a)(3). Progressive is already aware of this action because its adjuster was deposed and has taken no steps to be substituted. More importantly, because summary judgment is being entered on all of the claims, the court sees no value in holding up disposition of the case to see if Progressive is interested in prosecuting it.

**III.  Raziev's sanctionable conduct**.

The Show Cause Order cited another, independent reason for summary judgment:  Raziev's sanctionable conduct leading up to and including this case.   As described in that Order, Raziev committed a fraud by obtaining a loss payment for the truck based on a mileage figure that Raziev knew was understated. (Show Cause Order at 11-20.)  By means of that fraud, Raziev recouped the initial purchase price of the truck – and more – after he had driven it for six months.

Daniel Billisitz, the insurance claims specialist for Progressive, attempted to obtain mileage information in order to estimate the value of the truck. (Dep. Daniel Billisitz at 9-10, 32.) [Dkt 180-1.] Billisitz testified that he could not get the mileage from the odometer or ECU, and that Raziev told him that the mileage was "505,000."   Billisitz's contemporaneous notes confirm the conversations.  (*See* Show Cause Order at 13-14.)  Raziev admits that he told Billisitz that the truck had approximately 460,000 miles when he bought it and approximately 505,000 miles at the time of the accident. (Pl.'s Resp. Defs.' Stmt. of Facts at ¶¶ 26-27; Compass Defs.' Stmt. of Facts ¶¶ 26-27.)[7]  He testified that he told the insurance representative that the odometer had a problem, but that "when I bought the truck it had 459,000 miles on [it]." (Raziev Dep. at 107.)  "The only story that

---

[7] Raziev's Response to Defendants' Statement of Undisputed Facts [dkt 170] does not summarize the statement to which he responds, contrary to Local Rule 56.1(b)(3)(A). It is necessary to refer to Defendants' Statement of Uncontested Material Facts [dkt 164-2] to see what Raziev has admitted.

Although Raziev was speaking through a Russian interpreter when he spoke to Billisitz (*see* Raziev Aff. ¶  4), he was represented by counsel at his deposition and his counsel prepared and signed his Response to the Defendants' Statement of Uncontested Material Facts.  If there was some misunderstanding about what Raziev told Billisitz, counsel would presumably have clarified it.

I told him was when I bought the truck it was 459,000 miles and I don't know how many miles there were at the time of the accident." (*Id.* at 109.)

Raziev did *not* tell Progressive that the truck had *at least 588,000* miles when he bought it six months earlier. He had driven it in his work as a commercial truck driver for six months since he bought it. He knew that the truck had more than 588,000 miles on it at the time of the accident – most likely closer to 600,000 miles, if not more. That is almost 100,000 miles greater than his number of 505,000.

Raziev's response to the Show Cause Order does not deny his earlier testimony or that he told Progressive the number "505,000." He does deny, though, that he withheld documents, and now states under oath that Progressive asked him only for the title, which was with Compass. (Raziev Aff. ¶ 6.) That is contrary to Billisitz's testimony and notes, which reflect that Billisitz specifically asked Raziev for documentation about the mileage. It is also contrary to *Raziev's own response* to the Compass defendants' statement of facts, in which Raziev stated, "Progressive asked for service records and Raziev could not provide service records." (Pl.'s Resp. Defs.' Stmt. of Facts ¶ 25.) At the time he talked to Billisitz, Raziev had the service record showing 507,820 miles in 2010, which he had printed out in March 2012 and subsequently attached as Exhibit C to his Amended Complaint. (Am. Compl., Ex. C.) [Dkt 27-1.]

More importantly, Raziev's response to the Show Cause Order does not explain or justify telling Progressive "505,000" when he knew he had documents showing the mileage was much more than that. Raziev had confronted Petrushevski five months earlier with the 2010 repair record showing the odometer reading of 507,820 and with Vladi's advertisement stating the truck had 588,000 miles. (Am. Compl.,¶¶ 14-16, 20; Exs. C and E.)

Billisitz asked Raziev about mileage on more than one occasion, but Raziev never mentioned those documents in his possession showing mileage substantially more than 505,000. Instead, Raziev accepted a salvage value greater than the purchase price he paid six months earlier. Within months of telling Billisitz that the truck had 505,000 miles at the time of the collision in September 2012, Raziev pled that the truck had "at least 588,000 actual miles" when he bought it in March 2012, attaching documents he had failed to disclose to Progressive. (Am. Comp. ¶ 45.)

There is also the problem of Raziev's contradictory testimony. As described above, each time Raziev has testified under oath about the mileage on the odometer when he bought the truck, he states a different number. In his effort to respond to the question in the Show Cause Order about the photograph that he claims he took before he bought the truck, Raziev now says that he took only one photograph of the odometer, which he took *before* he bought the truck, and that he believes that the photograph was used by the dealer on the repair record. (Raziev Aff. ¶¶ 8-10.)[8] The only odometer photograph in the record shows 462,137 miles – not 459,000 or 416,000.

Raziev argues that he should not be sanctioned for taking no steps to preserve the odometer or the ECU, blaming Progressive for not advising hom that the truck was physical evidence. (Pl.'s Resp. at 35-36.) Every party has the responsibility to preserve evidence relevant to its claims, and Raziev knew in March 2012 that he intended to sue the Compass defendants. Whether or not Bird believes that the odometer or ECU would have recorded when it was altered, the odometer and ECU were still material evidence to the claim Raziev intended to bring. As Bird testified, the fact that the

---

[8] That testimony itself does not make sense. Raziev testified he brought the truck into the dealership for a repair after returning from a trip to Columbus, Ohio. (Raziev Dep. at 39-40.) Why would the dealer use mileage from a photograph taken before the truck had been driven on a long-distance trip, rather than the mileage that was on the odometer at the time it came into the dealership?

insurance adjuster was unable to get mileage from the odometer because the battery cables were cut does not mean that the ECU itself was damaged. The Compass defendants had a right to have their forensic expert examine the odometer and ECU. At the very least, the odometer and ECU would have recorded the final mileage on the truck, disclosing how much Raziev was able to use the truck, which is evidence relevant to whether he was damaged by the alleged mileage misrepresentation.

Raziev claims it is "purely coincidental" that this lawsuit was filed on the very day the truck was consigned to salvage. (Pl.'s Resp. at 36.) His attorney states in a conclusory manner that he conducted a "reasonable investigation" before filing the lawsuit, as required by Fed. R. Civ. P. 11. (Aff. Todd C. Lyster ¶ 1.) [Dkt 201-3.] He does not state when he began his investigation; presumably it was some time in advance of the filing of the lawsuit. He also states, "Plaintiff's attorney had no knowledge, whatsoever, what was taking place in connection with Plaintiff's insurance claim . . . ." (Pl.'s Resp. at 36.) Before filing an action asserting a claim under the Odometer Act, however, a reasonable inquiry would have required Raziev's counsel to ask, "Do you still own the truck? Where is the truck now?" Those questions would have led to information about the collision, the insurance claim, and the sale of the truck for salvage.

The Amended Complaint in this case was not filed until May 2013. By then, Raziev's counsel knew or should have known that the truck had been sold months earlier and Raziev received an insurance payment for a cash value of more than $41,000 after he had driven it as a commercial vehicle for six months. It is impossible to see how a reasonable attorney, knowing that fact, could plead in good faith that "Plaintiff has been damaged in that the true value of the vehicle that he purchased was worth less than the amount he paid for it, namely Forty One Thousand and 00/100 Dollars ($41,000.00)." (Am. Compl. ¶ 24.)

As stated in the Show Cause Order, this case is an effort to get a windfall on top of a fraud. A reasonable inquiry would have shown that Raziev made no effort to preserve evidence relevant to his claims and that he obtained more than the full purchase price of the truck after he had driven it for six months because he concealed information about the actual mileage of the truck. Raziev himself has repeatedly given contradictory testimony under oath, including about the most basic fact in his claim: what the odometer read when he bought the truck.

This lawsuit, which should not have been filed, has cost parties of modest means considerable expense and loss of productive time. The court reiterates the conclusions in the Show Cause Order that allowing this lawsuit to continue would "raise concerns about the integrity and credibility of the civil justice system." *See Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993).

The court concludes that judgment must be entered in favor of the Compass defendants and against Raziev on all counts of his Amended Complaint. Costs under 28 U.S.C. § 1920 are awarded to the Compass defendants, and Raziev and his counsel are jointly and severally liable for those costs. Because the Compass defendants' Third-Party Complaint [dkt 66] is the result of their being sued by Raziev, that Third-Party Complaint is dismissed with prejudice as moot. The third-party defendants (Ivakimov, Donka, and Vladi) incurred costs because of their involvement in this unnecessary litigation. In the case of Donka and Vladi, the court recruited counsel to represent them. As a sanction under Fed. R. Civ. P. 11 and this court's inherent authority, Raziev and his counsel are ordered to pay Ivakimov's, Donka's, and Vladi's costs under 28 U.S.C. § 1920, and are jointly and severally liable for those costs.

In considering the issue of sanctions against Raziev and his counsel, the court concludes that an award of attorneys' fees is likely to involve the parties in further prolonged litigation. For that reason, the court awards costs but not attorneys' fees.

## CONCLUSION

For the reasons set out above, judgment is entered in favor of Compass Truck Sales, LLC and Alex Petrushevski, and against Adil Raziev. The Third-Party Complaint of Compass Truck Sales, LLC and Alex Petrushevski against Atanas Ivakimov, Donka Choumanova, and Vladi Choumanov is dismissed with prejudice as moot. The costs under 28 U.S.C. § 1920 incurred by Compass Truck Sales, LLC, Alex Petrushevski, Atanas Ivakimov, Donka Choumanova, and Vladi Choumanov shall be taxed against Adil Raziev and his attorney of record, Todd C. Lyster, jointly and severally. All pending motions are stricken as moot. This is a final and appealable order.

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

June 7, 2016